HARWELL & HARWELL, INC., Appellant,

v.

Ruben Roland RODRIGUEZ et al.,
Appellees.

No. 15042.

Court of Civil Appeals of Texas,
San Antonio.

July 19, 1972.

Rehearing Denied Nov. 1, 1972.

Stayton, Maliney, Black, Hearne & Babb, Austin, Johnson, Offer & Simcock, Alfred W. Offer, San Antonio, for appellant.

Southers, Mendelsohn, Goldberg & Lyons, Inc., Frank R. Southers, House, Mercer, House & Brock, Chester H. Brown, Jr., San Antonio, for appellees.

KLINGEMAN, Justice.

This suit was brought by Ruben Roland Rodriguez, against Norman Harwell Associates, Inc. and Harwell & Harwell, Inc., for damages allegedly resulting from injuries sustained by plaintiff as a result of a fall from a ladder on a construction job of which Norman Harwell Associates, Inc., was the general contractor, and Harwell & Harwell, Inc., was a subcontractor. At the time of the accident, plaintiff was employed by Stanley Smith Detectives, Inc., as a guard-watchman on the construction site. National Standard Insurance Company intervened and pleaded certain subrogation rights as to any recovery by plaintiff against defendants. Trial was before a

jury and, based upon its verdict, the trial court entered judgment for plaintiff and against defendant, Harwell & Harwell, Inc., in the total amount of $200,000.00, out of which sum plaintiff was ordered to pay intervenor, National Standard Insurance Co., $21,980.54, and to pay intervenor's attorney's fees in the sum of $1,000.00. A take-nothing judgment was entered as to defendant, Norman Harwell Associates, Inc. Thereafter plaintiff filed a remittitur of $10,800.00. Harwell & Harwell, Inc., only appeals from such judgment.

Appellant asserts twenty-two points of error. For the purpose of this opinion, said points of error will be divided and discussed under the following general areas: (a) points of error pertaining to "no duty"; (b) points of error pertaining to the jury's findings respecting the ladder involved; (c) points of error pertaining to the admission of certain alleged opinion evidence; (d) points of error pertaining to erroneous special issue submission; (e) error of the court in refusing to admit Defendants' Exhibit No. 5 into evidence; (f) improper jury argument; (g) error of the court in admitting into evidence certain portions of plaintiff's oral deposition; (h) jury misconduct and alleged improper conduct of plaintiff's counsel in connection therewith; and (i) error of the court in admitting into evidence life expectancy tables.

### No Duty

By four points of error appellant asserts that the trial court erred in entering judgment for plaintiff because there are no pleadings and no findings that appellant owed any duty to plaintiff with respect to the ladder in question, and because there is no evidence or insufficient evidence to support a finding that appellant owed any duty to plaintiff with respect to such ladder.

Appellant asserts vigorously that there was no evidence of probative value that plaintiff occupied the status of an invitee but that plaintiff was injured while occupying the status of a licensee; and that the only duty appellant owed plaintiff was the duty not to injure him willfully, wantonly, or through gross negligence. Under these points of error the principal question for determination is the legal status of plaintiff—was he an invitee or was he a licensee.

Appellant relies in part on Smith v. Henger, 148 Tex. 456, 226 S.W.2d 425 (1950), where the Court held that a general contractor on a construction job who is in control of the premises is burdened with the duty to use due care to provide a safe place for workmen on the premises, including the employees of other contractors. Appellant therefore asserts that a subcontractor is not responsible for the safety of the premises. Appellant relies chiefly on Olivier v. Snowden, 426 S.W.2d 545 (Tex.1968), where the Supreme Court in a five to four decision held as a matter of law that an employee of a general contractor who was injured while using equipment of a subcontractor was a licensee and not an invitee of such subcontractor in the use of such equipment. The Court stated that in the absence of a showing that the use of such equipment by others worked in some way to the benefit of the owner, that such employee was a licensee and not an invitee, and that Snowden's (the injured employee) use was for the sole benefit of the general contractor.

The Court said that the true test to be applied was whether the owner of a scaffold or other equipment receives benefits or advantages from the permitted use by another of that particular piece of equipment. The Court quoted from Munson v. Vane-Stecker Co., 347 Mich. 377, 79 N. W.2d 855, involving a similar question, to the effect: "The test to be applied . . . in determining whether a plaintiff was a licensee or an invitee is whether there existed mutual interests and mutual advantages to the parties concerned from the use of the equipment belonging to one party and left for use by another in the carrying on of a project in which both were interested."

In Cowart v. Meeks, 131 Tex. 36, 111 S.W.2d 1105, 1107 (1938), the Court said: "'In the absence of some relation which inures to the mutual benefit of the two, or to that of the owner, no invitation can be implied, and the injured person must be regarded as a mere licensee.'" The Supreme Court of the United States in the case of Bennett v. Louisville & Nashville Railroad Co., 102 U.S. 577, 584–585, 26 L. Ed. 235 (1881), said: "'The principal . . . appears to be that invitation is inferred where there is a common interest or mutual advantage, while a license is inferred where the object is the mere pleasure or benefit of the person using it.'"

Plaintiff was employed by Stanley Smith Detectives, Inc. as a guard-watchman. Stanley Smith was engaged by the general contractor, Norman Harwell & Associates, Inc., to supply a security service for an apartment complex being constructed at 750 W. Mayfield in San Antonio, Texas. The contract between the general contractor and Smith was an oral one, but there is testimony that Smith had agreed to provide general security for the entire site, to prevent unauthorized persons from entering the premises, and to prevent loss from theft, arson and vandalism on the site. There was testimony that there was quite a problem with thieves on construction sites in San Antonio, and just about anything on a job site is subject to be stolen including tools, appliances and material. Although Norman Harwell Associates, Inc. was the general contractor, there was various subcontracting, including earth work, plumbing, electrical, concrete work, roofing, sheet metal work and including Harwell & Harwell, Inc., which was the subcontractor for the rough carpentry work.

On the night of the accident, a few minutes after midnight, a car drove up to the job site, turned off its lights and plaintiff saw a figure run into the area of the job site. Plaintiff gave chase to the prowler and while pursuing such prowler, he attempted to climb the ladder in question when a rung broke, causing him to fall to the ground and sustain severe injuries. Such ladder was constructed by nailing 1" x 4"'s horizontally as rungs or steps to vertical studs on the apartment shell.

Plaintiff testified that in his duties as guard-watchman he patrolled the entire construction site area, checking on everything such as tool boxes, equipment left out, etc.; and that he was ordered to write down the location where he found any tools and to bring them in. He testified that one of the carpentry supervisors told him that the place had been burglarized before; and that he was cautioned by such supervisor to be on the lookout and was warned that there were some tools missing and to be on his toes.

There was testimony that the ladder was built for anybody working on the premises, and the carpentry foreman testified that any ladder built on the job was built not just for the carpenters but for all others requiring the use of the ladder to get on the second floor. Certainly plaintiff's purpose in climbing the ladder in question was not for his own convenience, benefit or pleasure. As a guard-watchman on the premises, plaintiff's duties were to protect the entire job site from prowlers, trespassers, children, thieves, arsonists and vandals. At the time of the occurrence of the accident, he was in pursuit of a suspected prowler.

The question here to be decided is whether or not plaintiff's use of appellant's ladder in attempting to apprehend the prowler on the job site was to the mutual advantage, interest and benefit of appellant. It would appear from the record that the job in which plaintiff was engaged as a general security watchman to protect the entire site from prowlers, trespassers, arsonists and vandals was mutually beneficial to all concerned and in the mutual interest of all the contractors on the job. We cannot say that appellant has received no benefits or advantages from the permitted use of the ladder.

All of appellant's "no duty" points of error are overruled.

*Points of Error Pertaining to The Ladder Involved*

By four points of error appellant complains that there is no evidence and/or insufficient evidence to support the jury's finding that appellant was negligent in permitting the rung in question to be used in the ladder with only one nail in each end;[1] and that there is no evidence and/or insufficient evidence to support the jury's findings that appellant was negligent in permitting the rung with diagonal grain to be in the ladder.[2]

In this regard it is appellant's contention that there is no evidence or insufficient evidence that appellant built the ladder in question or that appellant had any duty to remove any ladder built by somebody else.

The ladder in question was made up of 1" x 4" boards that were nailed diagonally across upright studs, and was constructed by nailing strips of lumber to studs of one of the buildings. Such ladder is referred to by a number of terms including carpenter's ladder, make-shift ladder and carpenter's throw-up ladder. There is testimony that these types of ladders were common on the job site. It is undisputed that appellant had the carpentry contract for the job site. Mr. Gill, the carpentry foreman for appellant, testified that they built all the ladders that were used by his men and also for all the subcontractors that would have to get up on the second floor at that stage of the building; that he personally supervised the building of the ladders for the job; and that any ladder that might have been built on the job to get up on the second floor would have been built by Harwell & Harwell, Inc., personally under his supervision. He did testify that

the job at that time was not at a stage when you would build a ladder for it; and that they did not have any ladders at all at such time. He testified, however, that Harwell & Harwell, Inc. was required to put up the "in-place" ladder after the decking was complete and there is testimony in the record that such decking was complete on the second floor at the time of the accident. The evidence is overwhelming that such ladder had been constructed and was in place at the time of the accident. The plaintiff testified in some detail about such ladder that he fell from; that when he was pursuing the prowler, he shined his flashlight around. He noticed on his right a ladder someone had made by nailing strips of lumber between two studs of the building, which he tried to climb in pursuing the prowler. He further identified it from photographs that were taken shortly after the accident. Two policeman who were called to the accident immediately after the accident saw such ladder, and one of such policemen climbed the ladder about thirty minutes after plaintiff's fall. Felix Sczepanik, a carpenter who worked for appellant, came on to the job about 8:00 a. m. the morning after the accident, and he testified that the ladder was there at such time; that the rungs or steps were made of 1" x 4" boards; that one of the boards was hanging on by one nail, which piece was split crosswise; and that he replaced such board. Sczepanik further testified that the board split from the top left diagonally down to the bottom right and split from the top left diagonally through the nail hole on the right; that the wood used was No. 2 grade yellow pine; that it had knot holes in it; that the way the board was split was the way you would expect No. 2 grade lumber to split; that he would never

---

1. In answer to Special Issues Nos. 1, 2, 3 and 4 the jury found that on the occasion in question a rung broke when plaintiff attempted to climb the ladder; that the rung in question was constructed with only one nail at each end; that the appellant was negligent in permitting the rung in question to be used in the ladder with only one nail on each end; and that such negligence was a proximate cause of plaintiff's fall.

2. In answer to Special Issues Nos. 5, 6 and 7 the jury found that the rung in question had diagonal grain; that the appellant was negligent in permitting the rung with diagonal grain to be in the ladder; and that such negligence was a proximate cause of plaintiff's fall.

put up a step ladder like that with one nail in it; and that ladders like the one in question were all over the job.

Under the record there is sufficient evidence that the ladder in question was built by appellant. The jury's answers to Special Issues Nos. 1, 2, 3, 4, 5, 6 and 7 are all sufficiently supported by the evidence.

*Points of Error Pertaining to Admission of Alleged Opinion Evidence*

By its Point of Error No. 9 appellant asserts that the trial court erred in allowing plaintiff's witness, Sczepanik, over appellant's objection, to express the opinion that the ladder was built by a carpentry crew, and in Point of Error No. 10 appellant asserts that the trial court erred in allowing the witness, Staggs, over appellant's objection, to express the opinion that the ladder was built by a carpentry crew.

With regard to Staggs' testimony, it is to be noted that appellant objected only to Staggs' statement that the ladder was " . . . called a carpenter's throwup, built for each construction job out there." At such time appellant's attorney stated that he would have to object to the conclusion that the carpenters built it because there is no proof that the carpenters built it, which objection was overruled. At the time Staggs had not testified that the carpenters built such ladder but was merely describing the type of ladder.[3] No objection was made to Staggs' subsequent testimony in this connection. Staggs was a Stanley Smith Detectives, Inc. employee in charge of all the jobs and had many years of experience in the security field, and had previously been a security guard on construction job sites. Appellant's Point of Error No. 10 is without merit and is overruled.

Nor do we find any reversible error with regard to Sczepanik's testimony complained of in Point of Error No. 9.[4] Sczepanik was an experienced carpenter and had been working on the job for appellant on the Mayfield job site for some time. He was familiar with the usual and customary proceedings with regard to the construction of carpenters' ladders. He testified that he did not know who constructed such steps, but that it was another crew ahead of him, which would be a carpentry crew. Sczepanik's specific job at such time was putting up outside framing for the second floor, and he testified that at the time of the accident the second floor

---

3. "Q. See that? What is that going up the wall?
"A. Ladder.
"Q. What kind of a ladder?
"A. It's called a carpenter's throwup, built for each construction job out there.
"MR. OFFER: I would have to object to the conclusion that the carpenters built it because there's no proof that the carpenters built it.
"THE COURT: I overrule the objection.
"MR. OFFER: Note our exception.
"Q. That's the kind of ladder carpenters throw up on a construction job?
"A. Yes, sir.
"Q. You've seen them frequently?
"A. Yes, sir.
"Q. And you've seen them on that job on Mayfield?
"A. Yes, sir.
"Q. You've seen many of them there, haven't you?

"A. Yes, sir.
"Q. They were all over that job site, were they not?
"A. Yes, sir."

4. "Q. Do you know who constructed those steps?
"A. No, sir, I don't. It was another crew ahead of me.
"Q. Another crew ahead of you?
"A. Yes, sir.
"Q. Would that be a carpentry crew?
"A. Yes, sir.
"MR. OFFER: If the Court please, I don't believe this man could state a carpenter crew built them. I think that would be an opinion and conclusion on his part that the carpenters built it.
"THE COURT: I overrule the objection.
"MR. OFFER: Note my exception."

was not framed up yet, but that the decking or sub-floor was put up already; that the plumbers are ahead of them before they frame up the second story. There is testimony that the plumbers at such stage of the construction would require a ladder to get up on the second floor. We think from the entire record that Sczepanik had stated sufficient facts to express his opinion on the matters asked him to which objection was made. Ordinarily the trial court must determine if the proposed witness had sufficient opportunity for observation and experience in line with the subject under inquiry to entitle him to give his opinion based on the evidence produced; and when the court has determined such matter, an appellate court will not disturb its decision unless it appears that the trial court has abused its discretion. See Montgomery Ward & Co. v. Levy, 136 S.W.2d 663 (Tex. Civ.App.—Fort Worth 1940, writ dism'd, judgm. cor.); Guerra v. San Antonio Sewer Pipe Co., 163 S.W. 669 (Tex.Civ. App.—San Antonio 1914, no writ); 2 McCormick & Ray, Texas Law of Evidence, Sections 1394–1399.

■ In any event, such error would not have been harmful error. Rule 434, Texas Rules of Civil Procedure. There was other testimony in the record that any ladder built at this stage of construction would have been built by appellant. Appellant's general carpentry foreman testified that any ladder built on the job for use to reach the second floor would have been constructed by appellant; that appellant was required to put up "in-place ladders" after the decking was complete; and there was testimony that decking had been completed for the second floor. Appellant's Point of Error No. 9 is overruled.

*Points of Error Pertaining to Erroneous Special Issue Submission*

Appellant asserts that the trial court erred in submitting Special Issues Nos. 3 and 6,[5] because such issues as submitted are a comment on the weight of the evidence in that they assume that appellant had some duty or responsibility in connection with the ladder. It also complains that Special Issue No. 3 is too vague, indefinite and confusing in that: (a) it inquires about "the rung in question" thereby failing to inform the jury as to which rung of the ladder was the subject of the inquiry; and (b) it inquires as to whether appellant was negligent "in permitting" the rung in question to be used in the ladder thereby allowing the jury to speculate as to whether reference was to a ladder built by appellant or by someone else. It further complains that Special Issue No. 6 is too vague, indefinite and confusing in that: (a) it inquires about "the rung with diagonal grain" thereby failing to inform the jury as to which rung in the ladder was the subject of the inquiry; and (b) it inquires as to whether appellant was negligent "in permitting" the rung with diagonal grain to be used in the ladder thereby allowing the jury to speculate as to whether reference was to a ladder built by appellant or someone else.

Special Issues Nos. 3 and 6 must be taken into consideration with the jury's answer to Special Issue No. 1 wherein the jury found that on the occasion in question a rung broke when plaintiff attempted to climb the ladder; Special Issue No. 2 wherein the jury found that the rung in question was constructed with only one nail in each end; and Special Issue No. 5 wherein the jury found that the rung in question had diagonal grain. Appellant

5. Special Issue No. 3: Do you find from a preponderance of the evidence that Harwell & Harwell, Inc. was negligent in permitting the rung in question to be used in the ladder with only one nail on each end? "

Special Issue No. 6: "Do you find from a preponderance of the evidence that Harwell & Harwell, Inc. was negligent in permitting the rung with diagonal grain to be in the ladder? "

makes no complaint here with regard to Special Issues Nos. 1, 2 and 5.

We have previously discussed the matter of whether appellant owed any duty to plaintiff with respect to the ladder in question, holding that plaintiff was an invitee of appellant, rather than a licensee, in the use of the ladder on the occasion in question.

■ Appellant owed invitees the duty to keep the premises in a reasonably safe condition to prevent injuries.

With regard to appellant's complaints pertaining to Special Issues Nos. 3 and 6, we deem it appropriate at this time to review the pertinent evidence in this connection. Plaintiff testified that as he was pursuing the prowler, he saw a ladder with 6 or 7 rungs; that when he was on the second rung with his feet, which he estimated to be 4 or 5 feet from the ground, he grabbed an upper rung with his right hand, and it broke; that he fell between 8 to 12 feet; that he thought he had rung No. 6 or 7 in his right hand; that when the rung broke he fell backwards on the concrete. A police officer, Mr. Wilburn, who investigated the accident shortly after it happened, found plaintiff on his back on top of a board, with his face up and the ladder immediately to his feet. Wilburn found that one rung was hanging from the ladder on his left side, and he identified the hanging rung by circling it on a picture (Plaintiff's Exhibit No. 2) as the second rung from the top. Two other officers, who arrived at the scene of the accident shortly after it had occurred, testified that the circled rung on Plaintiff's Exhibit No. 2 was hanging down at the time that they were at the scene of the accident. The morning after the accident two investigators of Stanley Smith Detectives, Inc. went to the job site and took pictures which were admitted into evidence. At such time no rungs were hanging down, but a new board appeared as a top rung near the top of the ladder. A 5-foot-square area was searched at such time and about 3 feet from the ladder. One board split horizontally was found and photographed, and said picture was introduced into evidence.

Felix Sczepanik, a carpenter for appellant, came to work about 8:00 a. m. the morning after the accident. His testimony is conflicting in some respects, but he testified that when he came to work the ladder was broken; that one board was hanging from the left side by one nail; and that it had split in half crosswise from the top left diagonally to the bottom right through the nail hole. He stated that the ladder had 6 steps and he thought he had replaced two steps. The top most board replaced had diagonal grain and the split had occurred along the grain through the nail hole. Mr. Gill, a carpentry foreman, stated that crisscross or diagonal grain would weaken the board and that it would be more liable to break with use, and that the use of diagonal grain in a rung in a ladder was not good carpentry practice. Both Sczepanik and Gill agreed that 1″ x 4″ rungs should have two nails.

■ In our opinion Special Issues Nos. 3 and 6, when taken together with Special Issues Nos. 1, 2 and 5, fairly submit the different theories of contention and are sufficiently clear and definite. Under the record we do not regard Special Issues Nos. 3 and 6 as comments on the weight of the evidence, nor as being too vague, indefinite and confusing. Appellant's points of error pertaining to erroneous jury submission are overruled.

*Points of Error Pertaining to The Court's Refusal to Admit Defendant's Exhibit No. 5 into Evidence*

By its 17th point of error appellant asserts that the trial court erred in refusing to admit into evidence a statement purportedly signed by plaintiff in order that the jury could compare the signature on the statement with admittedly genuine signatures of the plaintiff so as

to determine whether or not plaintiff signed the statement and should be held responsible for the statements therein contained.

The statement referred to is a typewritten statement, dated December 11, 1969, supposedly taken by a representative of appellant, but which plaintiff denied signing. It is appellant's contention that certain portions of the statement are contrary to the testimony of plaintiff, and which are damaging to plaintiff's theory of the case. In particular, it asserts that portions of the statement squarely contradict plaintiff's testimony from the witness stand that he fell only a few feet.[6] The court refused to admit such statement into evidence on the ground that no proper predicate had been laid.

The only handwritten portion of such statement is a signature thereon which purports to be that of plaintiff. Such statement is not sworn to. Plaintiff denied that he signed such statement and testified that the statement was prepared by a man who said he was working for Harwell-McCombs; that the man insisted on putting some material in there that was not correct; and that he did not sign anything because he did not agree with it. Although the court did not permit the introduction of such statement into evidence, it did permit appellant's counsel to read before the jury the excluded statement through questions and answers propounded to plaintiff. Further, the jury heard other evidence cumulative to the statement and appellant asserts in its brief that plaintiff admitted that substantially all the statements contained in such exhibit are correct. There is no testimony whatsoever that plaintiff signed the statement. The person who allegedly prepared and took the statement did not testify.

The statement was not properly identified.

While we do not regard the refusal to admit such statement into evidence as error, in any event, we do not regard it as harmful error. As hereinbefore stated, the statement was presented to the jury through questioning of plaintiff by appellant's counsel. The chief complaint urged by appellant with regard to the exclusion of such statement is appellant's contention that portions of such statement squarely conflict with plaintiff's testimony from the witness stand that he fell only a few feet. While in one instance plaintiff did testify that he fell only a few feet, he testified in other instances that he fell between 8 and 11 feet, and such testimony is not necessarily inconsistent in that he testified that at the time of the fall his feet were on the second rung of the ladder, which he estimated to be 4 to 5 feet from the ground, when he grabbed an upper rung with his right hand, which broke causing him to fall. Plaintiff is 6 feet tall which would place portions of his body 10 to 11 feet from the ground floor, and which would also place portions of his body at the top of the ladder. We do not regard such statement and his testimony as necessarily conflicting. There was other testimony in the record which substantially corroborates plaintiff's testimony, and the jury heard other evidence cumulative to all of the material contained in the statement. We do not believe that appellant was harmed by the exclusion of such statement.

### Improper Jury Argument

Appellant's 18th point of error asserts that the trial court erred in not granting

---

6. Such exhibit contains the following statement: "There is a platform serving as a floor for the second story. I assuned [sic] the boy was on the that platform and was going up to get him. I started up a ladder that was nailed to the frame and was straight up. I got up to the top of the ladder that is all I remember until I woke up on the concrete floor which was about 10 feet from the top of the ladder."

appellant a new trial because of improper and prejudicial argument of counsel for plaintiff.

The particular argument complained of is as follows:

"Now, ladies and gentlemen, in regard to this pain and suffering—man, that's a lot of money. Yes, it is a lot of money. And when Ruben said, 'Oh, my God, oh, my God, I am paralyzed', well, he's going to need a lot of money. If this case were being tried before Jesus Christ came on the scene we would be under the Old Testament 'an eye for an eye and a tooth for a tooth.'

"MR. OFFER: If the Court please, I don't believe that's proper argument. There's no evidence of what he's arguing, and it's just going outside the record.

"THE COURT: I overrule the objection.

"MR. OFFER: Note our exception."

The test for reversal for improper jury argument is that it must appear not only that the argument was improper but that it was such as to satisfy an appellate court after a review of all the record that it was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case. Rule 434, supra; Home Insurance Co. v. Greene, 443 S.W.2d 326 [Tex.Civ.App.—Texarkana 1969, affirmed 453 S.W.2d 470 (Tex.1970)]; Texas Sand Co. v. Shield, 381 S.W.2d 48 (Tex.1964); Aultman v. Dallas Railway & Terminal Co., 152 Tex. 509, 260 S.W.2d 596 (1953).

We have carefully examined the entire record including the jury arguments and we conclude that the argument complained of was not of such nature as was reasonably calculated to cause and probably did cause the rendition of an improper judgment.

## Error of The Court in Admitting into Evidence Certain Portions of Plaintiff's Oral Deposition

By its 19th point of error appellant asserts that the trial court erred in permitting plaintiff's counsel, over objection, to offer into evidence and to read from plaintiff's oral deposition in an attempt to bolster plaintiff's testimony from the witness stand by his prior testimony in the deposition.

After counsel for plaintiff had called plaintiff to the stand and during the process of his testimony, counsel for plaintiff read to the jury portions of an oral deposition of plaintiff through questions being read by counsel and answers being read by plaintiff. Appellant's counsel objected on the ground that this was an attempt to bolster the witness's prior testimony by attempting to use the deposition, which objection was overruled. Appellant's counsel had previously read to the jury selected portions of plaintiff's deposition through questions propounded to plaintiff.

Appellant relies on Perez v. San Antonio Transit Company, 342 S.W.2d 802 (Tex.Civ.App.—Eastland 1961, writ ref'd). This case did not involve a deposition, but a written accident report made by the driver of a bus a few hours after the happening of the accident, which was admitted into evidence by the trial court. The appellate court stated that the general rule is that if a witness or an agent or servant of a party to a law suit *has not been impeached*, prior consistent statements by the witness, either oral or in writing, are not admissible to bolster or corroborate his testimony. The court held that the admission of such written report was erroneous but was not reversible error.

It is plaintiff's contention that appellant, by use of selected portions of plaintiff's oral testimony, had sought to impeach him, and in order to combat this impeachment attempt, as well as to bring out omitted parts of the deposition testimony for con-

tinuity, parts of the oral deposition were read to the jury.

In Texas Employers' Insurance Ass'n v. Pillow, 268 S.W.2d 716, 720 (Tex.Civ.App. —Fort Worth 1954, writ ref'd n. r. e.), the Court said: "It is no ground for objection to the reading of the deposition that the witness is present in court and able to testify in person, and it is immaterial whether or not the witness has been placed on the stand and has testified. 15 Tex. Jur., p. 94, § 51; Schmick v. Noel, 64 Tex. 406; O'Connor v. Andrews, 81 Tex. 28, 16 S.W. 628; Casualty Reciprocal Exchange v. Dawson, Tex.Civ.App., 81 S.W. 2d 284."

■ After plaintiff had first testified, appellant read into the record certain portions of plaintiff's oral deposition which tended to impeach plaintiff's direct testimony. Under such conditions we do not believe the court erred in thereafter allowing plaintiff's counsel to also read from such deposition. In any event, considering the record as a whole, the reading of such objected to portions of the testimony did not constitute reversible error. Rule 434, supra.

### Jury Misconduct

By two points of error appellant complains that the trial court erred by not granting a new trial because: (a) the jury was guilty of misconduct in determining first how much total damages should be awarded, and then splitting such total among the various elements inquired about through the court's charge; and (b) the action of plaintiff's counsel in interfering with the judicial process by obtaining from members of the jury, immediately after the jury was discharged, the signatures to identical prepared statements to the effect that there had been no jury misconduct.

Eleven jurors testified on the hearing for the motion for new trial. In general they testified that all issues were separately discussed; that some of the jurors wanted to give damages in excess of $200,000.00, but

that all jurors wanted to give at least $200,000.00, and that there was some discussion that they could not give any amount in excess of the amount prayed for by plaintiff; that the answer to each damage question was made according to the evidence as they understood it; and that it was a unanimous verdict based upon the evidence after a discussion regarding the evidence upon each issue.

■ In order for misconduct of the jury to constitute grounds for new trial it is no longer necessary that there only be reasonable doubt as to the effect of such misconduct, but such misconduct must be material and must appear from the record as a whole that injury probably resulted to the complaining party. Rule 327, T.R.C.P.; Trousdale v. Texas & New Orleans Railroad Co., 154 Tex. 231, 276 S.W.2d 242 (1955); Milstead v. Aynesworth, 341 S.W.2d 942 (Tex. Civ.App.—Texarkana 1960, writ ref'd n. r. e.); Lantex Construction Co. v. Lejsal, 315 S.W.2d 177 (Tex.Civ.App.—Waco 1958, writ ref'd n. r. e.); Hudson v. West Central Drilling Co., 195 S.W.2d 387 (Tex.Civ.App. —Eastland 1946, writ ref'd n. r. e.).

■ The trial court's refusal to grant a new trial upon an express or implied finding of no occurrence of jury misconduct is ordinarily binding on the reviewing court and will be reversed only where a clear abuse of discretion is shown. State of Texas v. Wair, 351 S.W.2d 878 (Tex.1961); Maryland Casualty Co. v. Hearks, 144 Tex. 317, 190 S.W.2d 62 (1945); Barrington v. Duncan, 140 Tex. 510, 169 S.W.2d 462 (1943); Carter v. Carter, 466 S.W.2d 399 (Tex.Civ. App.—Tyler 1971, writ ref'd n. r. e.).

The record does not establish any jury misconduct that would require a reversal of this case.

■ The trial court did not commit reversible error in refusing to grant a new trial because of the action of plaintiff's counsel in obtaining from the members of the jury panel, immediately after the jury had been discharged, signatures to identical

prepared statements to the effect that there had been no jury misconduct.[7] The eleven jurors who appeared on the motion for new trial were questioned by appellant's counsel and none of the jurors said that they were coerced or forced to sign such statement, and there is no evidence that the signing of such statement influenced them in any way. Appellant did not produce any evidence of any harm suffered by appellant as the result of the jurors signing such statement. Appellant's point of error in this regard is without merit and is overruled.

### Error of The Court in Admitting into Evidence Life Expectancy Tables

By its last point of error appellant urges that the trial court erred in allowing plaintiff, over the objection of appellant, to place in evidence certain life expectancy tables because there was no proof that plaintiff came within the class of persons to which the tables were applicable.

The life expectancy table which was introduced into evidence reflected a life expectancy for plaintiff of 35.8 years. The gist of appellant's complaint is that plaintiff was not a person of ordinary health and that such tables would have no application to him.

■ The fact that a person may be in poor health does not affect the admissibility of mortality tables, but goes more to the weight to be attached to such mortality tables. Byrd v. Trevino-Bermea, 366 S.W.2d 632 (Tex.Civ.App.—Austin 1963, no writ); Hemsell v. Summers, 138 S.W.2d 865 (Tex.Civ.App.—Amarillo 1940, no writ); American National Ins. Co. v. Points, 81 S.W.2d 762, 766 (Tex.Civ.App.—El Paso 1935, writ dism'd); Galveston, H. & S. A. Railway Co. v. Johnson, 58 S.W. 622 (Tex.Civ.App.1900, writ ref'd). Mor-

tality tables have been held admissible in cases where it is shown where the persons whose life expectancy was in question were in poor health. Sanders v. Universal Life & Accident Ins. Co., 74 S.W.2d 301 [Tex. Civ.App.—El Paso 1934, opinion adopted 102 S.W.2d 405 (Tex.Com.App.1937)]; Cf. Huey v. American National Ins. Co., 45 S.W.2d 340 [Tex.Civ.App.—Austin 1932, reversed and rendered 66 S.W.2d 690 (Tex. Com.App.1933)]; American National Ins. Co. v. Points, supra; Pecos & N. T. Railway Co. v. Williams, 78 S.W. 5 (Tex.Civ. App.1903, no writ); Galveston, H. & S. A. Railway Co. v. Leonard, 29 S.W. 955 (Tex. Civ.App.1894, writ ref'd).

■ There was a multitude of testimony before the jury about the extent of plaintiff's injuries and the state of his health, and he was before the jury for their observation. There was considerable evidence as to his earning capacity, including income tax reports, which showed in general an increased earning capacity over the latter period of years and evidence that in the type of civil service job he was regularly working, his earning would increase periodically over the years. Life expectancy tables are only one factor to be weighed in determining how long a person might live and are not of themselves determinative of the expectancy of every person, and a trier of the facts can find that a particular individual will probably live for a different number of years.

■ The court did not commit reversible error in admitting such life expectancy tables into evidence.

All of appellant's points of error have been considered, and all are overruled.

The judgment of the trial court is affirmed.

---

7. e. g.: (2) the jury did not discuss or consider attorney's fees; (4) the jury did not determine the answer to any question by lot or by chance or by a quotient method; etc.